# United States Court of Appeals
## For the First Circuit

No. 13-1008

OMJ PHARMACEUTICALS, INC.,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

William L. Goldman, with whom Robin L. Greenhouse, Nathaniel J. Dorfman, McDermott Will & Emery LLP, Jerome A. Swindell, Assistant General Counsel, and Johnson & Johnson were on brief, for appellant.
Teresa E. McLaughlin, Attorney, Tax Division, with whom Bethany B. Hauser, Attorney, Tax Division, and Kathryn Keneally, Assistant Attorney General, were on brief, for appellee.

June 3, 2014

**KAYATTA, Circuit Judge**.  From 1976 until 1996, section 936 of the Internal Revenue Code made available to U.S. corporations a tax credit fully offsetting the federal tax owed on income earned in the operation of any trade or business in Puerto Rico.  In 1996, Congress enacted the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, 110 Stat. 1755, setting in motion the complete repeal of section 936, ameliorated by a ten-year transition period during which the credit remained available only to taxpayers who had claimed it in previous years.  During the final eight years of that transition period, the taxable income that an eligible claimant could take into account in computing its credit was capped at an amount roughly equal to the average of the amounts it had claimed in previous years.  Though the cap was generally fixed, it could be adjusted up or down to account for a taxpayer's purchases and sales of businesses that had themselves generated credit-eligible income.  Thus, as the parties agree, if one U.S. corporation sold to a second U.S. corporation a business that accounted for $1 million in average prior year credit claims, the credit cap for the purchasing corporation would normally increase by $1 million, and the credit cap for the selling corporation would normally drop by the same amount.

This appeal requires us to decide, in a case of first impression, the effect on a U.S. taxpayer's credit cap of a sale of a line of business in Puerto Rico to a foreign corporation that

-2-

does not pay U.S. corporate income taxes. Having made three such sales, appellant OMJ Pharmaceuticals, Inc. ("OMJ"), argues that it was not required to reduce its cap by the amount of credit-eligible income associated with the lines of business sold because the buyer, as a foreign corporation, had no credit cap to increase or even establish. The government disagrees, arguing that regardless of whether the purchaser of a line of business could increase or establish a credit cap, a seller was required to reduce its own cap by the amount associated with the line of business. On cross-motions for summary judgment, the district court sided with the government, rejecting OMJ's claim for a tax refund of approximately $53 million. Because we read the controlling provisions of the Internal Revenue Code to require otherwise, we reverse and remand with instructions to enter summary judgment in OMJ's favor.

## I.  Background

### A.  The Puerto Rico and Possessions Tax Credit

Between 1976 and 1996, Congress encouraged U.S. corporations to invest in Puerto Rico and other U.S. territories by establishing a possessions corporation system of taxation. Congress implemented that system primarily by creating the "Puerto Rico and possession tax credit," codified in section 936 of the Internal Revenue Code. See generally Dep't of the Treasury, The Operation and the Effect of the Possessions Corporation System of

<u>Taxation</u>, Sixth Report (1989).  As described by the Treasury Department:

> The possessions corporation system of taxation is a set of rules under which a U.S. corporation deriving qualifying income from possessions and Puerto Rico pays no income tax to the United States.  As a U.S. corporation, a possessions corporation is subject to federal tax on its worldwide income. However, a special credit available under section 936 fully offsets the federal tax on income from a trade or business in Puerto Rico and from qualified possession source investment income (QPSII).  A U.S. parent corporation can, in turn, offset dividends received from a wholly owned 936 subsidiary with a 100 percent dividends-received deduction, which frees the dividend income from federal tax.

<u>Id.</u> at 5.

In 1996, Congress amended section 936 to terminate the credit, subject to certain transition rules.  Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1601, 110 Stat. 1755, 1827, 26 U.S.C § 936 (amended 2007).  Under the transition rules, an existing credit claimant--that is, a taxpayer who previously claimed the credit, § 936(j)(9)--could continue to claim the credit for up to ten years, § 936(j)(3).  Beginning in the 1998 tax year, however, the amount of the credit became subject to a cap roughly equal to the annual average of a claimant's inflation-adjusted possession income for the five taxable years immediately preceding 1995.  <u>See</u> § 936(j)(2)(B), (3)(A), (4), (5).

Though the cap was based on past activity, it was not entirely fixed.  Under certain circumstances, if a taxpayer acquired a trade or business that itself qualified for the credit,

the acquiring taxpayer could add to its own cap the historic tax attributes of the acquired trade or business, enabling the acquiror's new cap to reflect the historic credit-eligible expenditures of both entities.  See § 936(j)(5)(D); accord H.R. Rep. No. 104-737, at 292 (1996) (Conf. Rep.) ("The adjusted base period income of the existing credit claimant from which the assets are acquired is divided between such corporation and the corporation that acquires such assets.").  The selling corporation would then subtract from its cap the same amounts.

## B.  OMJ's Transactions

OMJ is a Delaware corporation that (among other things) develops, manufactures, and distributes healthcare products.  Its principal place of business is Puerto Rico.  Between 1993 and 1998, OMJ reported income from manufacturing operations in Puerto Rico.  The parties agree that throughout the period on which this litigation is focused, OMJ remained eligible to claim the section 936 credit.

On November 30, 1998, OMJ transferred three of its wholly-owned subsidiaries--Janssen Ortho, LLC, Ortho Biologics, LLC, and Lifescan, LLC--to a fourth company.  That fourth company, OMJ Ireland, Ltd. ("OMJ Ireland"), was an Irish corporation also owned entirely by OMJ.  OMJ Ireland had never paid or been required to pay U.S. income taxes.

After the transfers, OMJ paid income tax for 1999 and 2000 in the amounts it would have owed had its credit cap been reduced by the amount associated with the three businesses it sold. Later, however, OMJ filed two amended returns, claiming a refund of $27,537,675 (which it later adjusted to $22,874,764) for 1999 and a refund of $37,928,839 (which it later adjusted to $30,094,104) for 2000, justifying each on the ground that the credit cap reduction was unnecessary. The Internal Revenue Service disagreed and denied the refunds. OMJ, in pursuit of its refund claims, filed this suit soon afterwards.

The district court, concluding that section 936 required a credit cap reduction upon the sale of any trade or business, no matter who the buyer, granted summary judgment to the United States. OMJ appealed.

## II. Standard of Review

We review the district court's grant of summary judgment de novo. Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013); see also Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991) (reciting the "familiar" principle that summary judgment is "appropriate when the pleadings and other submissions 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56)). In conducting our de novo review, we accord to the IRS Commissioner "a presumption of correctness, so the

taxpayer bears the burden of proving that an assessment was erroneous." Shafmaster, 707 F.3d at 135 (citing Hostar Marine Transp. Sys., Inc. v. United States, 592 F.3d 202, 208 (1st Cir. 2010)). Adding heft to this burden is the principle, applicable here, that because "[i]ncome tax deductions and credits are matters of legislative grace," MedChem (P.R.), Inc. v. Comm'r, 295 F.3d 118, 123 (1st Cir. 2002), "credit should be allowed only where there is 'clear provision therefor.'" Id. (quoting New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934)).

### III. Analysis

This case arises in part because neither Congress nor the IRS wrote any rules for implementing the details of the credit cap adjustments. Rather, in the portion of the tax code governing the possessions credit transition period, Congress provided as follows: "ACQUISITIONS AND DISPOSITIONS.--Rules similar to the rules of subparagraphs (A) and (B) of section 41(f)(3) shall apply for purposes of this subsection." 26 U.S.C. § 936(j)(5)(D). Section 41(f)(3), which has nothing to do with the possessions corporation tax regime aside from this cross reference, generally governed the calculation of the tax credit for increases in research expenditures. The parties are in agreement that section

936 should be interpreted to create a framework as similar as possible to section 41's.[1]

We take it as an undisputed given that Congress looked to section 41 because that section implemented a framework, like the one created by section 936, under which calculation of a tax benefit was driven in great part by the taxpayer's experience in prior years. In creating the credit for expenditures on qualified research, Congress chose to limit the credit to increases in research spending. In simplified form, research spending in a given year established a floor above which such spending had to rise in a subsequent year in order to justify a credit, which would be limited to the incremental increase.

The comparison of one year to another for calculating the credit under section 41 posed the question of what to do when a company sold a line of business to which some or all of the prior year's research expenditures were devoted. For example, a company buying such a line of business might plausibly claim to have incrementally increased its own research spending in the year following the acquisition, even though it merely added to its prior research spending that of the acquired business line. In adopting

---

[1] At oral argument, the government emphasized that section 936 and section 41(f)(3) "have to be applied the same way," and that "whether the attributes go away, or go to the acquiror, has to be the same in both cases." There being nothing in the statute or legislative history to compel a different reading, we adopt here the parties' preferred construction.

section 41(f)(3), Congress rejected that position, instead reflecting in the statute its judgment that such transactions involve mere shifts of spending from firm to firm, rather than increases in overall research spending.  Accord H.R. Rep. No. 97-201, at 124-25 (1981) ("If the provision did not include rules for changes in ownership of a business, a taxpayer who begins business by buying and operating an existing company might be entitled to a credit even if the amount of qualified research expenditures were not increased.").  To avoid creating a tax credit for such shifts, Congress provided as follows:

> **(3) Adjustments for certain acquisitions, etc.**--Under regulations prescribed by the Secretary-
>
> **(A) Acquisitions.**--If, after December 31, 1983, a taxpayer acquires the major portion of a trade or business of another person (hereinafter in this paragraph referred to as the "predecessor") or the major portion of a separate unit of a trade or business of a predecessor, then, for purposes of applying this section for any taxable year ending after such acquisition, the amount of qualified research expenses paid or incurred by the taxpayer during periods before such acquisition shall be increased by so much of such expenses paid or incurred by the predecessor with respect to the acquired trade or business as is attributable to the portion of such trade or business or separate unit acquired by the taxpayer, and the gross receipts of the taxpayer for such periods shall be increased by so much of the gross receipts of such predecessor with respect to the acquired trade or business as is attributable to such portion.

26 U.S.C. § 41(f)(3) (amended 2013).

And to address the opposite problem--the possibility that a company that merely sold a line of business might be faulted for decreasing its research (even though that research was continued by

-9-

another)--Congress addressed the sell side of such transactions in the next subparagraph:

> **(B) Dispositions.**--If, after December 31, 1983–
>
>> **(i)** a taxpayer disposes of the major portion of any trade or business or the major portion of a separate unit of a trade or business in a transaction to which subparagraph (A) applies, and
>>
>> **(ii)** the taxpayer furnished the acquiring person such information as is necessary for the application of subparagraph (A),
>
> then, for purposes of applying this section for any taxable year ending after such disposition, the amount of qualified research expenses paid or incurred by the taxpayer during periods before such disposition shall be decreased by so much of such expenses as is attributable to the portion of such trade or business or separate unit disposed of by the taxpayer, and the gross receipts of the taxpayer for such periods shall be decreased by so much of the gross receipts as is attributable to such portion.

Id.

Staying for the moment with the treatment of the research credit floor, the question posed by analogy in this case is how to treat a seller under section 41(f)(3)(B) when a line of business is sold to a foreign corporation that pays no U.S. corporate income tax and to whom there would therefore be no basis for an adjustment under the buy-side provision of subparagraph (A).  OMJ argues that in such a case, the seller would not have been entitled to decrease its research credit floor, because such a decrease was required only after a transaction that triggers a buy-side increase under subparagraph (A).  And if the sale would not have decreased the

seller's research credit floor, reasons OMJ, then it cannot have decreased its possessions tax credit cap.

The United States balks at OMJ's straightforward reading of section 41(f)(3). The government argues that section 41(f)(3)(A) would indeed "apply" to an acquisition of a business line by any "acquiring person," whether or not that person paid any U.S. corporate income tax--which is to say, whether or not there could be any buy-side increase in the research credit floor. The government's reading, however, would mean that the sell-side adjustments are made any time there is a sale of a trade or business, because in every sale there is an acquiror. But if Congress had intended such a result, it could easily have so stated, and there would have been no reason for the cross-reference to subparagraph (A). Indeed, the cross-reference in (B) to "transaction[s] to which subparagraph (A) applies" strongly indicates that there must be some dispositions of credit-generating trades or businesses to which subparagraph (A) does not apply, unless the last eight words of subparagraph (B)--"in a transaction to which subparagraph (A) applies"--are to be treated simply as surplusage. See generally Duncan v. Walker, 533 U.S. 167, 175 (2001) ("We are . . . reluctan[t] to treat statutory terms as surplusage . . . ." (alteration in original) (internal quotation marks omitted)); MedChem (P.R.), Inc. v. Comm'r, 295 F.3d 118, 125-

-11-

26 (1st Cir. 2002) (rejecting an interpretation of section 936 that would have rendered a term redundant).

The government briefly argues that because the Department of the Treasury has, by regulation, defined the term "acquisition" to include a "liquidation," see Treas. Reg. § 1.41-7(b), it follows that any liquidation of a major portion of a business can generate a subparagraph (B) reduction--even if the liquidation does not result in a corresponding increase in the research credit floor of a buyer. The failures of this logic are manifold. Most importantly, the argument assumes that if the word "acquisitions" is defined to include a particular type of transaction, then any transaction of that type will give rise to a decrease under subparagraph (B). But the rule that dictates the outcome in this case has nothing to do with the breadth of the term "acquisitions"--a term that appears nowhere in subparagraph (B). Instead, we are guided by the basic principle (on which regulation § 1.41-7(b) casts precisely no doubt) that subparagraph (B) applies only to dispositions involving transactions "to which subparagraph (A) applies." Liquidation or not, a transaction that does not involve a buyer is not one to which subparagraph (A)--a provision aimed explicitly and exclusively at the behavior of a purchaser of a major portion of a trade or business--applies.

The government's fallback position is that even if subparagraph (A) does not apply to every transaction involving a

credit-generating business, it applies whenever the acquiror may be subject to payment of any type of U.S. tax, whether or not it pays the type of tax--corporate income tax--that could be affected by an increase in the research credit floor. We cannot agree. Subparagraph (A) refers not only to "a taxpayer," but also to modifications of qualified research expenses and gross receipts-- modifications that are possible only if the acquiring party is subject to the sorts of taxes to which the credits at issue apply. To say that subparagraph (A) "applies," therefore, is to suggest that there is something that might undergo the specified adjustments. The government's myopic focus on the term "taxpayer" simply obscures the broader point that, "taxpayer" or not, a sale to an entity that has no obligations under subparagraph (A) is not a transaction to which subparagraph (A) applies.

This reading of subparagraph (A) is reinforced by unambiguous textual indications elsewhere in section 41(f)(3). For example, although the government argues that subparagraph (B)(ii) broadens subparagraph (B)'s applicability by referring to an "acquiring person," rather than an "acquiring taxpayer," subparagraph (B)(ii) in fact explicitly restricts the scope of that provision by expressing the additional requirement that in order to avail itself of a decrease, a sell-side taxpayer must "furnish[] the acquiring person such information as is necessary for the

application of subparagraph (A)."  We glean two points from this language.

First, the language confirms that not every sale results in a decrease in the research credit floor.  If the seller fails to give the buyer the "information as is necessary for the application of subparagraph (A)," the subparagraph (B) reduction does not occur.

Second, and even more saliently, the statute's recognition that information is needed from the seller in order to allow "application of subparagraph (A)" strongly implies that "application" means some adjustment to the buyer's U.S. corporate tax attributes.  The "application of subparagraph (A)" thus most naturally means the use of subparagraph (A) to require an increase in the buyer's research credit floor.  And although the government relies on legislative history to suggest that Congress understood the interaction of subparagraphs (A) and (B) differently, that history demonstrates precisely the opposite.  See H.R. Rep. No. 97-201, at 125 (1981) ("This relief [i.e., the subparagraph (B)(ii) decrease] is not provided unless the taxpayer furnishes the acquiring person with information needed to compute the credit under the acquisition rules described in [subparagraph (A)].").  In short, section 41(f)(3)'s language and legislative history compel the conclusion that the decrease under subparagraph (B) cannot

occur when the buyer is not a U.S. corporate taxpayer, because in such a case, subparagraph (A) cannot apply.

Undaunted by these considerations, the United States proposes that we disregard the strong indications given by the language of subparagraphs (A) and (B) in favor of certain policy concerns that it suggests animated Congress's adoption of the provisions at issue. Given the government's insistence that we interpret section 936 as creating an adjustments regime as similar as possible to the one under section 41(f)(3), one might reasonably expect such policy arguments to focus primarily on the concerns underlying the research increase tax credit. But instead, the government points us to subparagraph 936(j)(9)(B), a provision with no section 41 analog, which states that "[i]f . . . a corporation which would (but for this subparagraph) be an existing credit claimant adds a substantial new line of business [other than one that itself counts as an existing credit claimant] such corporation shall cease to be treated as an existing credit claimant . . . ."

The government suggests that subparagraph (j)(9)(B) evinces Congress's intention to prevent corporations from claiming possessions tax credits for so-called organic growth. And the district court, though observing that such an at-all-costs pursuit of that policy would be "difficult to reconcile" with subparagraph (B)'s plain indication that a decrease is required only in the event of a corresponding increase, nevertheless agreed. It is on

-15-

this argument that the United States, largely waving to one side section 41's language, relies most heavily on appeal.

If the organic growth to which the government refers is the building of a new line of business that did not previously account for existing credits, then the government is certainly correct that subparagraph 936(j)(9)(B) evidences a disfavoring of such growth as a basis for credit generation. But there is no claim that OMJ grew such a new line of business. And while it is true that OMJ's construction of section 936(j)(5)(D) would likely not have benefitted OMJ unless it had some new income against which to apply the credit retained following the sales, Congress manifested no intention to disfavor use of the credit to offset income earned as a result of growth within pre-existing, retained lines of business. Indeed, the fact that Congress limited section 936(j)(9)(B) to the addition of new business lines evidences a decision not to apply its concepts to what would have been an obvious other form of growth not included in subsection 936(j)(9)(B). In this regard, subsection 936(j)(9)(B) actually undercuts the government's position.

The government's suggestion that Congressional intent requires us to read subparagraph (j)(9)(B) more broadly than its text would seem to allow also runs counter to the principle that, as a general matter, "[t]he best indication of Congress's intentions . . . is the text of the statute itself." E.g., South

Port Marine, L.L.C. v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 65 (1st Cir. 2000); see also In re Rudler, 576 F.3d 37, 44 (1st Cir. 2009) ("If the statute's language is plain, 'the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" (quoting Lamie v. United States, 540 U.S. 526, 534 (2004) (internal quotation marks omitted))). Whether or not we call the text of 41(f)(3) indisputably plain, all must agree that it does not read as one would expect it to had Congress intended that all sales of business lines would decrease a seller's cap. And, as we have observed, the legislative history supports this reading of section 41(f)(3) by confirming that Congress understood that a decrease would be available only when triggered by a buy-side increase.

Our interpretation is reinforced further by stepping back from a microscopic examination of a particular transaction and looking at the general impact of the parties' competing interpretations. Both the structure of the statute and the entire nature of the possessions tax regime make clear that the object of Congress's attention was the Puerto Rican economy. In terminating the possessions tax regime, Congress apparently intended to provide a transition period during which pre-existing credits for existing lines of business would generally remain viable, neither increasing nor decreasing. Section 936 furthers this apparent aim by ensuring that any increases in caps on the buy side would be offset by

-17-

decreases on the sell side, leaving the balance of caps in Puerto Rico as a whole largely unaffected.  To have required a decrease when there could have been no increase would have thrown off that balance and marginally decreased the size of the transitional cushion.  We see no indication that such was Congress's intent. Nor does the government claim that the reading of sections 41 and 936 for which OMJ advocates could be exploited to increase the total amount of credit claimed beyond the amount that could have been claimed but for the sale.  Indeed, given that the section 936 transition period long ago expired,[2] the government can point to no adverse collateral effects of applying the statute as it most naturally reads.

## IV.  Conclusion

As we observed at the outset of our discussion of section 936, the government adopted no rules addressing exactly how section 936(j)(5)(D) would work.  Instead, the government joins with OMJ in suggesting that the framework must replicate, as much as is possible, the rules expressed in section 41(f)(3).  The

---

[2]  Congress recently amended section 41(f)(3) to replace the phrase "taxpayer" in subparagraph (A) with the phrase "acquiring person," mooting for future research credit cases any need to decide what the word taxpayer means.  See American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 301(b), 126 Stat. 2313, 2326-2328 (2013).  Naturally, OMJ suggests that this reflects Congress's determination that a policy change was due, while the government suggests that the amendment was intended to codify what has always been understood.  In light of our conclusion that other sources of insight render the statute's meaning unambiguous, neither argument exerts much force.

language, structure, purpose, and history of those rules point uniformly to the conclusion that a reduction in a seller's cap as a result of the sale of a business line is appropriate only in the event of a corresponding increase in the buyer's cap. And since there is no claim that the transaction at issue in this case increased or could have increased any credit cap attributed to OMJ Ireland or its subsidiaries, the transfers did not reduce OMJ's credit cap. We therefore <u>reverse</u> the district court's order granting summary judgment to the United States and <u>remand</u> for the entry of summary judgment in OMJ's favor.

<u>So ordered</u>.