UNCLE HENRY'S INC., Plaintiff, Appellant/Cross–Appellee,

v.

PLAUT CONSULTING CO., INC., Defendant, Appellee/Cross–Appellant,

Edgewing, a Division of Plaut Consulting Inc., Defendant.

Nos. 03–2402; 03–2454.

United States Court of Appeals, First Circuit.

Heard Aug. 2, 2004.

Decided Feb. 22, 2005.

Edward P. Watt with whom Watt & Associates, P.C., Stephen C. Whiting and The Whiting Law Firm were on brief, for appellant.

Dale C. Kerester with whom John Dennis, Lynch, Brewer, Hoffman ·& Fink, LLP, James G. Goggin, Peter S. Black, and Verrill & Dana, LLP were on brief, for appellee.

Before TORRUELLA, DYK,* and HOWARD, Circuit Judges.

HOWARD, Circuit Judge.

These cross-appeals relate to an agreement to create a website that went awry. Uncle Henry's, Inc. ("Uncle Henry's") contracted with Plaut Consulting Co., Inc. ("Plaut") to create a new website. When the desired website was not produced, Uncle Henry's terminated the contract and

---

* Of the Federal Circuit, sitting by designation.

brought this action alleging breach of contract and various fraud-based claims. Plaut counterclaimed for quantum meruit and other relief. Plaut prevailed in part on summary judgment, and the parties effectively split on the claims that were tried to a jury. They both attempt to improve their results on appeal.

## I.

We present a brief summary of the facts as the jury could have found them, or, for matters disposed of on summary judgment, as the summary judgment record compels us to take them. *See Kenda Corp., Inc., v. Pot O'Gold Money Leagues, Inc.,* 329 F.3d 216, 225 (1st Cir.2003)(challenges to verdict); *Hodgkins v. New England Telephone Co.,* 82 F.3d 1226, 1229 (1st Cir.1996)(summary judgment standard). We reserve a more detailed discussion of some facts for our analysis.

Uncle Henry's is a Maine corporation based in Augusta that publishes a "Swap or Sell It Guide." While best known in Maine, the guide is also distributed throughout New England and parts of Canada. Uncle Henry's president and sole shareholder is Joseph Sutton, who resides in Texas. His two sons, Justin and Jason, both residents of Maine, run Uncle Henry's day-to-day operations.

Uncle Henry's first website was launched in 1999, with the intent of expanding Uncle Henry's business to compete with e-Bay and Yahoo!. This first website was not as successful as the Suttons had hoped. Further, because it was developed piecemeal, its structure and development were very poorly documented. Ultimately, in the summer of 2000, Uncle Henry's sought to hire a website developer

capable of creating a new and vastly improved website.

After considering certain other developers, Uncle Henry's selected Edgewing, a division of Plaut, to build its new website. Plaut is a Delaware corporation with its principal place of business in Atlanta, Georgia, and offices in various cities, including Waltham, Massachusetts. During extensive negotiations, the parties discussed such issues as "migrating" every feature from the existing website into the new site (albeit in an improved form) and the need to "reverse engineer" the existing site to determine its exact functions due to the shortcomings in the existing site's documentation. The negotiations took place primarily in Maine, although Justin and Jason Sutton made one visit to Plaut's Waltham facility. Uncle Henry's ultimately accepted Plaut's proposal to build the new website for $593,000.[1] Thereafter, the parties endeavored to reduce their understanding to a formal written contract, several versions of which passed among the parties and their respective attorneys.

The various versions of the contract included a generalized "master agreement" and a more specific "website development statement of work" ("SOW"), which included a scope matrix section that listed the various components of the proposed website (collectively the "contract"). All versions provided that the contract would be governed by Massachusetts law.

On October 20, 2000, Justin Sutton signed the then most recent version of the contract ("October contract") and sent Plaut two checks totaling $202,000. A $196,000 check represented the first payment on the website development agreement, and a $6,000 check represented the first payment on a separate website host-

---

1. This was a significant reduction of the originally proposed price of $717,600. The $593,000 contract price was ultimately increased, via the addition of a $52,100 change order, to $645,100.

ing agreement that the parties had entered into contemporaneously with the website development agreement.[2] The October contract contemplated a January 19, 2001 "go-live" (website completion) date. Plaut began work on the website development project in October, primarily in its Atlanta office. Plaut's original staff on the project became known as "Team I".

On October 30, 2000, Plaut notified Uncle Henry's that its counsel wished to make further changes to the contract. A subsequent version ("November contract"), signed by Plaut's President, Paul Shaughnessy, was sent to, but not signed by, Uncle Henry's. Further negotiations ensued. Ultimately, on December 7, 2000, after approval by Uncle Henry's counsel, Justin Sutton signed a revised version of the contract ("December contract"). Justin Sutton acknowledged at his deposition that this document represented the parties' agreement. Nevertheless, the signed version of the December contract was apparently never sent to Plaut. The December contract differed from the October contract in three significant respects: it limited Plaut's liability to Uncle Henry's to no more than the full contract price plus the value of any change orders (i.e., $645,100); capped recoverable attorney's fees at 20 percent of Plaut's maximum liability; and foreclosed consequential damages. A few weeks after signing the December contract, Uncle Henry's purchased Dell servers worth $77,382.99 for use with the new website and delivered them to Plaut's Waltham facility.

Uncle Henry's maintains that, during the course of the negotiations and shortly thereafter, Plaut made various misrepresentations regarding its capabilities, intentions, and the status of the project. Further complicating matters, during both the negotiation and contract period, third parties performed work on the existing website for Uncle Henry's. The parties dispute whether this outside work was further development of the site (including new features) or simply repairs and maintenance.

The parties' difficulties began in November during the design phase of the project. During this phase, Plaut attempted to get Uncle Henry's to "sign off" on certain functional specifications. Essentially, Plaut asked Uncle Henry's to agree that the only items that the new website needed to contain were those in a detailed list of functional specifications that Plaut generated. Plaut maintained that such a sign off was essential because Plaut could not create a new website unless it knew exactly what the site was to contain. Uncle Henry's was hesitant to agree, however, because it believed that the functional specifications tendered by Plaut did not include all the features from the original site that Uncle Henry's wanted incorporated. An impasse was reached, but Plaut continued to work on the site without a final approval of its listed functional specifications. As deadlines came and went, Plaut announced new completion dates, which also came and went. The design phase of the project was never completed.

On April 23, 2001, Uncle Henry's sent a formal notice of default to Plaut, triggering the 45–day cure period provided for in the contract. In the following weeks, there were heated negotiations for a new, modified contract, many of which took place between Joseph Sutton and Paul Shaughnessy. During this period, Plaut assembled a second project team ("Team

2. Plaut hosted Uncle Henry's existing website for much of the relevant period from its Wal-tham facility.

II") to assess Team I's progress and determine how best to proceed on the project. Among the options considered was starting the project over from scratch. During this period, work on the website was transferred from Plaut's Atlanta office to its Waltham facility.[3]

The negotiations during this period appear to have been focused on the possibility of a new agreement that Plaut would create a website that had the features Uncle Henry's believed were required in the original agreement, but at an extended deadline date and for a sum approximately equal to the balance owed on the original contract. Plaut expended significant resources working to create such a website during this period. No new agreement was reached, however, and Uncle Henry's terminated the contract on July 18, 2001. The new Uncle Henry's website was completed by Stroudwater NHG ("Stroudwater") approximately one year later, at a cost to Uncle Henry's of $604,000 for the "basic" website and many hundreds of thousands of dollars more for additional features.

In due course, Uncle Henry's brought this diversity action against Plaut asserting violation of the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A ("Chapter 93A"), fraud, negligent misrepresentation,[4] breach of contract, and conversion.[5] Uncle Henry's also sought a declaratory judgment that the December contract's limitation clauses were unenforceable. Plaut responded with a number of counterclaims: breach of contract; breach of the duty of good faith and fair dealing; quantum meruit; and promissory estoppel. Plaut also sought a declaratory judgment that the December contract governed the parties' relationship.

After discovery, Plaut filed a motion for summary judgment or partial summary judgment on Uncle Henry's various claims. The motion was referred to a magistrate judge, who issued a report and recommendation on the motion for summary judgment and on a motion to reconsider filed by Uncle Henry's after his initial ruling.[6] *See Uncle Henry's, Inc. v. Plaut Consulting, Inc.,* 240 F.Supp.2d 63 (D.Me.2003).

The magistrate judge rejected Uncle Henry's Chapter 93A claim because the challenged activity did not "occur primarily and substantially in Massachusetts"—a statutory requirement. *See id.* at 80–82. In this respect, the magistrate judge looked to where the defendant committed the alleged deceptive acts, where the plaintiff was deceived and acted upon the deception, and the situs of plaintiff's losses. *See id.* at 81 (applying the three factor test stated in *Roche v. Royal Bank of Canada,* 109 F.3d 820, 829 (1st Cir.1997)). Pointing out that all the challenged misrepresentations were received and relied upon in Maine (although some were also received in Massachusetts), that the contract was primarily negotiated in Maine, and that any damages were incurred in Maine, the magistrate judge concluded that the deception was not centered in Massachusetts.

---

3. It is essentially undisputed that Plaut could not have finished the website during the 45–day cure period.

4. Uncle Henry's Chapter 93A, fraud, and misrepresentation claims were all based on 31 statements alleged to have been made by Plaut to Uncle Henry's during their course of dealing.

5. Uncle Henry's maintained that Plaut failed to return the Dell servers that Uncle Henry's had delivered to Plaut for work on the project.

6. The district court deemed the magistrate judge's decision on the motion to reconsider as an amendment to the report and recommendation.

*See id.* He also emphasized that when deceptive statements are made in Massachusetts but received and acted upon in another jurisdiction, the wrongful conduct does not occur "primarily and substantially" in Massachusetts. *See id.* (citing *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 672 (1985) and *M & I Heat Transfer Products, Ltd. v. Gorchev,* 141 F.3d 21, 23–24 (1st Cir.1998)).

The magistrate judge further concluded that the fraud and misrepresentation claims were governed by Maine law and that Plaut was entitled to summary judgment on the great majority of the allegedly misleading statements. *See id.* at 82–88.[7] Specifically, he determined that 30 of the 31 alleged misrepresentations were not actionable under Maine law for one of three reasons: (1) misrepresentations 2–8, 12–13, and 16–19 [8] were mere promises of future performance; (2) misrepresentations 7, 9, 14, 20–28, and 30 were mere "puffing"; and (3) misrepresentations 10–11, 15, 29, and 31 were not relied upon by Uncle Henry's. *Id.* at 84–7. In so ruling, the magistrate judge determined that Uncle Henry's was not at Plaut's mercy because Uncle Henry's was a sophisticated business entity and was represented by experienced counsel who could and did make a detailed investigation prior to Uncle Henry's entering into the agreement. *Id.* at 85. The only surviving misrepresentation (number one) was one Plaut allegedly made in early December 2000, about the amount of progress it was making on the project. *Id.* at 87–88.

Next, the magistrate judge determined that the December contract, with its significant limitation on damages, governed the parties' relationship. *See id.* at 88–90. In reaching this conclusion, he deemed the following facts significant: there was no prescribed method of acceptance, so Uncle Henry's could accept by silence; negotiations continued after Uncle Henry's signed the October contract; negotiations continued after Plaut signed the November contract; Uncle Henry's counsel conveyed approval of the December contract to Plaut; Uncle Henry's signed the December contract; and Uncle Henry's admitted that the December contract represented the parties' agreement. *Id.* at 89–90. The magistrate judge also concluded, in ruling upon Uncle Henry's motion to reconsider, that even if the October contract was a binding contract, the December contract constituted a written modification of it.

Finally, as to the conversion claim, the magistrate judge first concluded that it failed for a lack of evidence that Plaut refused to return the equipment. *See id.* at 88. Upon reconsideration, however, the magistrate judge concluded that there was a triable issue as to whether Plaut had improperly failed to return the equipment during the period between the contract's termination (July 18, 2001) and the date that Plaut attempted (but failed) to return the equipment (August 23, 2001).

The parties filed numerous objections to the magistrate judge's report and recommendation, but the trial judge adopted it in its entirety. Thereafter, the case proceeded to trial on Uncle Henry's claims of breach of contract,[9] fraud, negligent mis-

---

**7.** Both sides conceded in the district court that the choice of law provision in the contract was not controlling on this issue.

**8.** We will use the magistrate judge's numbering convention, which was taken from a master list of misrepresentations in the summary judgment record. We have reproduced the

master list of alleged misrepresentations as an appendix to this opinion.

**9.** On the eve of trial, the district court concluded that the contract was ambiguous on the issue of what features were intended to be

representation, and conversion, and Plaut's claims of breach of contract and quantum meruit.

At trial, both sides presented several occurrence witnesses and experts. Uncle Henry's case theory was that it had relied upon Plaut's expertise in the development of the website, and Plaut had failed to live up to its obligations under the contract. Uncle Henry's asserted that Plaut improperly narrowed the scope of its duties under the contract by declaring bargained-for elements "outside the scope" of the contract, and improperly foisted website development obligations on Uncle Henry's that should have fallen to Plaut as the expert. Uncle Henry's also maintained that Plaut had misled it about progress on the new website, which led Uncle Henry's to remain in the relationship longer than warranted to its detriment.

Plaut's responsive case theory was that Uncle Henry's had been obliged to sign off on the functional specifications as a condition precedent to Plaut's performance, and that Uncle Henry's failure to do so excused Plaut from performing. Indeed, Plaut maintained that this failure rendered Plaut's timely performance impossible. Plaut also argued that Uncle Henry's breached the contract by unfairly insisting that Plaut include features in the site that had not been bargained for. In so arguing, Plaut took the position that Uncle Henry's continued development of its original website during the design period made it impossible to determine the features from the old site that were to be incorporated into the new one.

Following the close of evidence, the jury found that Plaut breached the December contract, Uncle Henry's was entitled to $402,000 in damages for the breach, Plaut did not commit fraud, Plaut did make a

negligent misrepresentation, Uncle Henry's was entitled to $202,000 in damages for this misrepresentation, Plaut did not convert Uncle Henry's property, there was no agreement to modify the December contract, Uncle Henry's did not breach the December contract, Plaut was entitled to a quantum meruit recovery for the reasonable value of its services performed after May 14, 2001, and Plaut was entitled to recover $240,000 for these services.

Concerned about possible duplication of damages, the trial judge stated that judgment would not be entered until the parties had presented arguments concerning the appropriate interpretation of the verdict. The judge considered these filings to be separate from any post-trial motions that the parties would file. In response to these submissions, the court concluded that the breach of contract and quantum meruit judgments were sustainable. *See Uncle Henry's, Inc. v. Plaut Consulting, Inc.*, 270 F.Supp.2d 67 (D.Me.2003). But, the court did reduce the award for the negligent misrepresentation count to $77,382.99. *Id.* at 70–71. In so doing, the court found that Uncle Henry's had expressly stipulated during the jury charge conference and closing argument that the only damages suffered due to the misrepresentation were those incurred in connection with its purchase of the Dell servers. *Id.*

The parties' multiple other post-trial motions were essentially all denied except for Uncle Henry's motion regarding an award of prejudgment interest. With regard to that motion, the district court concluded that, based upon the Massachusetts choice of law provision in the contract, Uncle Henry's was entitled to prejudgment interest on its contract damages at the 12 percent rate specified under Massa-

included in the website and that the parties

could present extrinsic evidence on this issue.

chusetts law. The court applied the Maine prejudgment interest rate on all other awards.

## II.

On appeal, Uncle Henry's presents five arguments: (1) the district court erred in entering summary judgment against it on its Chapter 93A claim; (2) the district court erred in granting summary judgment on the issue of whether the December contract bound the parties; (3) the district court erred in granting summary judgment on the bulk of Uncle Henry's fraud and misrepresentation claims; (4) the jury's quantum meruit award had no evidentiary support; and (5) the district court improperly· granted a remittitur on the misrepresentation claim without giving Uncle Henry's the option of a new trial. Plaut presents three arguments in its cross-appeal: (1) the district court erred in upholding the negligent misrepresentation verdict; (2) the district court erred in upholding the breach of contract verdicts; and (3) the district court erred in applying the Massachusetts 12 percent prejudgment interest rate to the contract damages. For ease of analysis, we shall reconfigure some of these arguments and address at least some of them under more general headings.

### A. Standard of Review

#### Summary Judgment

"We review a district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmovant." *Hodgkins v. New England Telephone Co.*, 82 F.3d 1226, 1229 (1st Cir.1996). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the· moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor." *Hodgkins*, 82 F.3d at 1229 (internal quote omitted). We may affirm a summary judgment decision on any basis apparent in the record. *Fabiano v. Hopkins*, 352 F.3d 447, 452 (1st Cir.2003).

#### Post-trial Motions

■ We review claims that the evidence does not support the jury verdict *de novo*. *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir. 2003). We will draw all reasonable inferences in favor of the winning party and will affirm unless we are persuaded that the evidence is so strongly inconsistent with the verdict that no reasonable jury could have returned it. *Id.*

■ "We review the denial of a motion for new trial for abuse of discretion, a similarly stringent standard which recognizes that a district court should grant such a motion only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice." *Foisy v. Royal Maccabees Life Insurance Co.*, 356 F.3d 141, 146 (1st Cir.2004) (citation and internal quotation omitted).

### B. Challenges to Entry of Summary Judgment

#### The Fraud/Misrepresentation Claims

Uncle Henry's argues that the district court erred in granting summary judgment on 30 of its 31 alleged misrepresentations. Uncle Henry's asserts that the court erroneously applied Maine choice of law principles in concluding that Maine law applied, erred in concluding, as a matter of law, that certain statements were mere

"puffing," and erred in concluding, as a matter of law, that certain statements were nonactionable promises of future performance.[10] Uncle Henry's argues that the jury could have found all the misrepresentations to have been actionable because Plaut controlled the information presented to Uncle Henry's, and because the misrepresentations were intended as assurances as to facts rather than mere opinions. Uncle Henry's also maintains that there was a trial-worthy issue as to whether it was entirely at Plaut's mercy regarding the veracity of Plaut's statements.

As to the choice of law issue, the parties agree that Maine looks to the Restatement(Second)of Conflict of Laws, and that conclusion is consistent with our precedent. *See Ricci v. Alternative Energy, Inc.*, 211 F.3d 157, 165 (1st Cir.2000). For claims of fraud and misrepresentation, the Restatement provides:

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations;

(b) the place where the plaintiff received the representations;

(c) the place where the defendant made the representations;

(d) the ... place of incorporation and place of business of the parties;

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time; and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws, § 148 (1971).

We discern no error in the magistrate judge's conclusion that Maine law governs Uncle Henry's fraud and misrepresentation claims. While Uncle Henry's is correct that few of the factors took place *entirely* in a particular state, each factor occurred *primarily* in a particular state. Four factors weigh in favor of Maine: Uncle Henry's acted in reliance on the misrepresentations in Maine, Uncle Henry's received all the misrepresentations in Maine (although some were also received in Massachusetts), Uncle Henry's is incorporated in Maine and has its principal place of business in Maine, and Uncle Henry's would perform under the contract (predominantly) in Maine. That Plaut made most of the misrepresentations in Massachusetts and that the unfinished website would be hosted in Massachusetts do not significantly alter the balance.

Turning to whether the magistrate judge properly entered summary judgment against Uncle Henry's on 30 of the 31 alleged misrepresentations, we begin by noting that Uncle Henry's has presented its challenge to these rulings at so high a level of generality, and in such an all-or-nothing manner, as to render any individualized assessment of each of the magistrate judge's specific rulings an exercise in guesswork. Such an individualized assessment of the various statements is critical, as the various representations are of dif-

---

**10.** Uncle Henry's does not challenge the district court's ruling that representations 10–11, 15, 29, and 31 are not actionable because Uncle Henry's did not rely on them.

ferent types and were made at different times, and some could conceivably qualify as actionable under the relevant legal standards while others may not. Under the circumstances, we think that Uncle Henry's has forfeited the right to an individualized assessment of the correctness of the magistrate judge's rulings with regard to each of the statements in question. *Cf. United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace") (citation and internal quotation omitted).

■ This still leaves Uncle Henry's more general argument, which is that all of the contested misrepresentations—even if they would ordinarily constitute non-actionable statements of opinion, promises of future performance, or mere "puffing," *see, e.g., Kearney v. J.P. King Auction Co.*, 265 F.3d 27, 37–38 (1st Cir.2001); *Veilleux v. National Broadcasting Co.*, 206 F.3d 92, 119–20 (1st Cir.2000); *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 65 (1st Cir.1992)—are actionable here because Uncle Henry's was at Plaut's mercy due to Plaut's exclusive control over the relevant information and/or its deliberate concealment of critical information during the course of the negotiations. *See Kearney*, 265 F.3d at 35–36 (exception to general rule that statements of opinion or future performance are nonactionable if receiver is "at the mercy" of speaker); *Veilleux*, 206 F.3d at 120 ("The relationship of the parties or the opportunity afforded for an investigation and the reliance, which one is thereby justified in placing on the statement of the other, may transform into an averment of fact that

which under ordinary circumstances would be merely an expression of opinion") (citation and internal quotations omitted); *Schott*, 976 F.2d at 65 ("puffing" statements may be deemed actionable if, under the circumstances, they could be reasonably understood as "assurances as to specific facts, rather than mere opinion").[11] In this case, no reasonable factfinder could agree with Uncle Henry's premise that it was at Plaut's mercy with regard to these representations. Rather, as the magistrate judge correctly observed, Uncle Henry's is a sophisticated business entity and was represented in the transaction by experienced counsel who investigated the proposed transaction at great length before Uncle Henry's entered into the agreement. We also note that Uncle Henry's negotiated the agreement aggressively (the contract price was 20 percent lower than the original bid), had experience with website development based upon its own efforts from 1999–2000, and was in contact with Plaut's developers during the project. We can discern no error.

## Contract Issues

Uncle Henry's argues that granting summary judgment on the issue of which contract governed the parties' relationship was improper because there were disputed issues of fact that warranted taking the matter to the jury. Uncle Henry's claims that the December contract cannot be binding because it did not constitute a valid offer by Plaut and Uncle Henry's never manifested acceptance of it. In its view, signing a document without delivering it to, or providing any other indication of assent to, the opposing party is not sufficient to constitute acceptance as a matter of law. Uncle Henry's further

11. Given our resolution of this issue, we need not decide whether the line of cases upon which Uncle Henry's relies extends to the area of puffing as well as opinions and promises of future performance.

maintains that a reasonable jury could conclude that the October contract is the controlling document because it was signed by Uncle Henry's, it was delivered to Plaut, Uncle Henry's made the first payment based upon it, and Plaut conveyed acceptance by cashing the check and starting performance. Relatedly, Uncle Henry's contends that the December contract was not a modification of the October contract.[12] Finally, Uncle Henry's asserts that, because the December contract does not govern the parties' relationship, the district court erred in applying its significant limitations on damages.

■ We think that the magistrate judge's alternate conclusion—that even if the October contract was a binding contract, the December contract constituted a written modification of it—is unassailable and renders further discussion academic. The October contract contains the following provision:

> Section 11.2 Amendment and Waiver
> No supplement, modification, amendment or waiver of this Master Agreement or any SOW shall be binding unless executed in writing by the party against whom enforcement of such supplement, modification, amendment or waiver is sought. . . .

There is no dispute that Plaut is seeking to enforce the December contract's limitation provisions against Uncle Henry's, and that Justin Sutton signed the December contract and acknowledged that it represented the parties' agreement. The October contract requires nothing more for a successful modification. Thus, even if the parties formed a valid contract in October, the December contract would govern their relationship as a binding, written modification that superseded the October contract.

### Chapter 93A Claim

■ Uncle Henry's maintains that the district court erred in granting summary judgment on its Chapter 93A claim. Uncle Henry's argues that the magistrate judge applied a now-superseded legal standard in assessing the viability of the claim, and, as a consequence, erred in concluding that the alleged deceptive practices did not take place "primarily and substantially" in Massachusetts—a requirement for the operation of Chapter 93A.

After the magistrate judge ruled, the Supreme Judicial Court of Massachusetts issued a ruling disavowing the use of any particular set of factors in determining whether alleged wrongful conduct occurred "primarily and substantially" in Massachusetts for purposes of Chapter 93A. *See Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 781 N.E.2d 787 (2003). Instead, the court opted to apply a more general standard which looks to "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish*, 781 N.E.2d at 799. We have acknowledged this modification in Massachusetts law. *See Kenda Corp.*, 329 F.3d at 234–35.

Uncle Henry's says that, under *Kuwaiti Danish*, a number of facts [13] not taken into

---

12. Uncle Henry's suggests in passing that a reasonable jury could find that there was no contract at all between the parties. As this terse claim is presented without authority or developed argument, it is forfeited. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990). Uncle Henry's also raises several arguments challenging the December contract that are contingent on its prevailing on its fraud/misrepresentation claims. In light of our discussion in the previous section, these arguments are not addressed.

13. Uncle Henry's argues that the magistrate judge failed to consider that Plaut was located in Massachusetts, that the website was to be developed in Massachusetts, that the Team I project manager was based in Massachusetts,

account by the magistrate judge militate in favor of a finding that the conduct at issue occurred primarily and substantially within Massachusetts. But the facts that Uncle Henry's tenders, even if made newly relevant by *Kuwaiti Danish* (a matter we do not decide), are not difference makers. Some of the facts certainly remain largely beside the point, notably that the existing website was hosted in Massachusetts and that the servers for the new website were stored in Massachusetts.[14] And as to the other factors, they simply do not outweigh the facts that informed the magistrate judge's ruling.

In holding that a set list of factors was of limited utility to the Chapter 93A inquiry, *see* 781 N.E.2d at 798, the *Kuwaiti Danish* court certainly did not hold or imply that the factors identified by the district court (derived from our *Roche* decision) are irrelevant to the Chapter 93A calculus. Nor did the court suggest that its prior decisions regarding how particular fact patterns are to be interpreted for purposes of Chapter 93A's situs requirement—for example, situations in which a misrepresentation is made in Massachusetts to a third party in another state who relies upon it there, *see Bushkin*, 473 N.E.2d at 672—have been overruled or superseded. Most significantly, *Kuwaiti Danish* did not retreat from the proposition that, if the significant contacts of the competing jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts. *See Bushkin*, 473 N.E.2d at 672; *see also Auto Shine Car Wash Systems, Inc. v. Nice 'N Clean Car Wash, Inc.*, 58 Mass.App.Ct.

685, 792 N.E.2d 682, 685 (2003)(applying *Bushkin* in post-*Kuwaiti Danish* case in determining whether plaintiff satisfied the "primarily and substantially" requirement). And under *Bushkin*, the magistrate judge's decision was clearly correct, especially in view of his finding that "the alleged misrepresentations were received primarily in Maine, where their impact primarily was felt." 240 F.Supp.2d at 81.

## C. Challenges to the Trial Results

### The Quantum Meruit Award

Uncle Henry's argues that the district court erred in denying its motion for judgment as a matter of law because the jury's quantum meruit award cannot be sustained. Uncle Henry's provides several reasons why: (1) quantum meruit is based on contract principles and no new agreement was formed after Uncle Henry's issued the default letter; (2) the parties' relationship was governed by an express contract, which was not terminated until July 2001, rendering quantum meruit inapplicable; (3) Plaut did not expect payment beyond that contemplated in the contract; (4) the circumstances show that Plaut's work was done gratuitously; (5) no services were rendered to Uncle Henry's, as the partial website was worthless; and (6) Plaut presented inadequate evidence of proper quantum meruit damages, as the cost of its services does not reflect their true value (of $0).

 To sustain a claim for quantum meruit under Maine law, which the parties agree governs here, the claimant must establish that services were provided to the

---

that most of the website work was done in Massachusetts, that the servers were sent to Massachusetts, that the new website was to be hosted by Plaut in Massachusetts, and that the existing website was hosted by Plaut in Massachusetts.

14. As previously noted, the separate hosting agreement for the pre-existing site is not part of this dispute, and the new website was never hosted by Plaut.

other party by the claimant, that the services were provided with the knowledge and consent of the other party, and that the services were rendered under circumstances that make it reasonable for the claimant to expect payment. *See Jenkins v. Walsh Bros.*, 776 A.2d 1229, 1235 (Me. 2001). "[D]amages are not measured by the benefit realized and retained by the defendant, but rather are based on the value of the services provided by the plaintiff." *Paffhausen v. Balano*, 708 A.2d 269, 271 (Me.1998). Mathematical certainty is not required in determining quantum meruit damages. *See Jenkins*, 776 A.2d at 1235-6. While quantum meruit is based upon implied contract principles, the formalities of an express contract are not required, and recovery may be had even if there is not a clear agreement by both sides to the same terms. *See Paffhausen*, 708 A.2d at 272; *see also Forrest Assoc. v. Passamaquoddy Tribe*, 760 A.2d 1041, 1045 (Me.2000)(quantum meruit is a quasi-contract theory).

Uncle Henry's arguments can be dispensed with in short order. Its contention that a modification agreement was never agreed to is irrelevant. It is undisputed that the parties were aggressively seeking to create a new agreement, and one does not need a formal contract to collect quantum meruit damages. *See Paffhausen*, 708 A.2d at 272.

Uncle Henry's alternative assertion that an express contract already governed the parties' relationship and therefore precluded a quantum meruit action also falls short. As an initial matter, a viable quantum meruit claim can co-exist with an express contract. *See, e.g., Combustion Engineering, Inc., v. Miller Hydro Group*, 812 F.Supp. 260, 262 (D.Me.1992)(applying Maine law), *aff'd*, 13 F.3d 437 (1st Cir.1993); *Prest v. Town of Farmington*, 117 Me. 348, 104 A. 521 (1918). But in any event, while the contract was not formally terminated until July 18, 2001 [15], the jury was entitled to find that the parties' dealings were extra-contractual during the period relevant to Plaut's quantum meruit claim, given the apparent impossibility of completing the website during the "cure" period and the immediate, intense negotiations for a new, modified contract. Maine courts have applied the quantum meruit doctrine in circumstances where parties continue to work together to complete a project after a material breach of their underlying contract. *See, e.g., Jenkins*, 776 A.2d at 1235. The jury was entitled to find that this was such a situation.

All of Uncle Henry's other arguments invite us to disregard the jury's prerogative as fact-finder. We decline the invitation. The jury heard voluminous and conflicting evidence regarding the post-default negotiations for a new agreement, the dispute about the scope of the original contract, the parties' expectations regarding payment, Plaut's reliance on the negotiations, both parties' actions during this period, the completeness and quality of Plaut's work on the website (including demonstrations of the website), and the efforts and resources expended by Plaut during the relevant period. "[The jury] weighs the contradictory evidence and inferences, judges the credibility of witnesses ... and draws the ultimate conclusions as to the facts." *Blake v. Pellegrino*, 329 F.3d 43, 47–48 (1st Cir.2003) (citation and internal quotation omitted). The jury was free to credit Plaut's evidence over Uncle Henry's on these issues.

## The Breach of Contract Award

Plaut argues that the jury's award of damages for breach of contract cannot

---

15. The termination occurred months after the "cure" period had expired.

stand. Plaut maintains that no rational jury could have concluded that Uncle Henry's fulfilled the condition precedent to Plaut's performance—agreeing on a basic website design. Plaut also contends that the district judge erred in concluding that the contract was ambiguous, which opened the door to jury confusion by permitting Uncle Henry's to introduce irrelevant and misleading evidence about the contract's terms. In Plaut's view, Uncle Henry's should not receive any award to compensate it for the Stroudwater website, as the arrangement with Stroudwater was not reasonable "cover" under the contract. Plaut further maintains that, to the extent that Uncle Henry's is entitled to any contract award, it should be limited to the amount that Uncle Henry's paid to Plaut ($203,500) under the contract.

From Plaut's perspective, Uncle Henry's failure to agree on a website design excused Plaut from any obligation to provide a completed website by the "go-live" date. But in so arguing, Plaut seeks to disregard the opposing evidence. Uncle Henry's presented considerable evidence showcasing Plaut's role in the failure to finalize a design. As we have just stated, it is the jury's role to assess conflicting evidence. *See United States v. Patel*, 370 F.3d 108, 112 (1st Cir.2004). Here the jury's decision is adequately supported.

As to whether the district court erred in concluding that the contract was ambiguous and allowing extrinsic evidence to be presented,[16] Plaut's thesis is that there is

no ambiguity because the five-page scope matrix in the SOW completely and unambiguously laid out exactly what the new website was to contain. Plaut's position is unpersuasive.

■ A contract is not ambiguous simply because the parties interpret it differently; it is ambiguous only if the language is susceptible to more than one meaning and reasonable persons could differ as to which meaning was intended. *See Foisy*, 356 F.3d at 147–48. Here there was ample support for the district judge's conclusion that the contract was ambiguous. First, the scope matrix included several sections marked "tbd," meaning "to be determined." Thus, the scope matrix was obviously not complete in and of itself as to every detail. Second, the SOW included both the statement that the existing website will be "migrated" to the new platform (with the term "migrated" undefined) and unelaborated references to contemplated "improvement[s]" and "enhancement[s]" of the migrated features.[17] Third, the SOW stated that a website was to be developed that would "include[ ]" the items in the scope matrix, which does not necessarily imply that the website was to be restricted to the items listed. Fourth, the items discussed in the scope matrix were stated in such a clipped manner that a reader could not reasonably have understood what they consist of without an explanation.

Plaut also maintains that the award cannot stand because the website ultimately

16. The parties dispute whether Plaut preserved this objection, but we shall proceed to the merits (which are more readily addressed).

17. Plaut contends that the highly specific scope matrix governs and that the more general provisions from the contract should be disregarded. While Plaut is correct that "specific terms generally control over more general terms," *see Bank v. IBM Corp.*, 145 F.3d

420, 427 (1st Cir.1998), there are other principles of contract interpretation that are relevant here, including that contracts are to be "read as wholes," "given effect as rational business documents," and "should not be read to render various sections contradictory or mere surplusage." *See Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir.2004); *Bank*, 145 F.3d at 429–30.

created by Stroudwater was not reasonable "cover" under the contract. The parties' agreement provided a choice of the following remedies to Uncle Henry's in the event of a breach by Plaut: "(i) a complete refund of amounts paid hereunder plus relocation costs under Section 5.3, or (ii) reasonable costs of cover in obtaining development services from another qualified provider of the Services described herein as necessary to attain go live status for such a Web site." Plaut concedes that a replacement website need not be identical to the one that Plaut attempted to create, but argues that the Stroudwater website could not reasonably be regarded as "cover" because it was based on a different software platform and included features not included in the agreement between Plaut and Uncle Henry's, and because Stroudwater made no attempt to complete the site that Plaut had partially built.

Plaut again disregards the evidence presented to the jury that was contrary to its position. The jury heard evidence about the Stroudwater arrangement, expert assessments of the quality and degree of completion of the Plaut website, expert assessments of the utility of completing the Plaut web site, Uncle Henry's activities in obtaining the website from Stroudwater, and Plaut's assessment of its own progress. Significantly, the jury did not award Uncle Henry's the full value of the (basic) Stroudwater contract. We may infer that the jury partially credited Plaut's evidence and reduced Uncle Henry's award accordingly. As to the amount of the award, "[t]ranslating legal damage into money damages ... is a matter peculiarly within the jury's ken." *Acevedo–Garcia v. Monroig*, 351 F.3d 547, 566 (1st Cir.2003) (citation and internal quotation omitted). Plaut presents no basis for disturbing the balance struck by the jury on this issue.

### The Negligent Misrepresentation Award

Both sides challenge the award of $77,382.99 on the negligent misrepresentation claim. Uncle Henry's claims that it is entitled to the jury's original award of $202,000 for the following reasons: (1) the award was not excessive and was amply supported by the evidence; (2) the district court engaged in an improper remittitur procedure that deprived Uncle Henry's of its Seventh Amendment jury trial rights; (3) Uncle Henry's did not stipulate to a lesser recovery, as lawyer argument is neither evidence nor a *de facto* jury instruction; and (4) the award was not duplicative, as the jury clearly intended to award Uncle Henry's the full value of the Stroudwater contract ($604,000), but deducted the $202,000 that it awarded Uncle Henry's under the misrepresentation theory from the contract award to avoid duplication. For its part, Plaut argues that the $77,382.99 award cannot stand because (1) the jury rejected the conversion claim, (2) it is duplicative of the contract award, (3) there was no reliance on the alleged misrepresentation, (4) the alleged misrepresentation was not a cause for the equipment being purchased, and (5) Uncle Henry's suffered no damages, as the equipment has not declined in value and remains available for Uncle Henry's.

Uncle Henry's claims are undermined by the following statement made by counsel during closing argument:

Did Plaut commit fraud on Uncle Henry's as the court has defined it. We submit the answer is clearly yes. What are the damages for that. The damages are that Uncle Henry's right after that, that same month, went out and ... purchased the Dell equipment. And in that Dell equipment, they spent $77,382.99 that would not have been spent because Justin testified we wouldn't have gone

forward with the contract had we known about that fraud.

The next question is for negligent misrepresentation, and it's slightly different from fraud, but basically the same facts, *and the same number would apply here.*

The next one is for a conversion, did Plaut Consulting convert the equipment. We talked about the facts for that. The amount of the damages would be this same amount, $77,382.

(emphasis added). Perhaps more significantly, similar comments were made in the jury instruction conference, in which Uncle Henry's emphasized that the misrepresentation damages were limited to the value of the Dell equipment to allay the trial judge's concerns about duplication issues among the various claims.

■ On this record, the district court was justified in concluding that Uncle Henry's stipulated to damages in the amount of $77,382.99 on the misrepresentation claim, or, phrased differently, waived any damages in excess of $77,382.99 on the claim.[18] Uncle Henry's made an affirmative representation to the court and opposing counsel, and the district court was entitled to hold Uncle Henry's to it. *See generally CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.,* 48 F.3d 618, 622 (1st Cir.1995)("We consider an express representation by an officer of the court to be a solemn undertaking, binding on the client."); *Crellin Tech., Inc., v. Equipmentlease Corp.,* 18 F.3d 1, 9 n. 10 (1st Cir.1994)(counsel is not free to disclaim

statements made in closing argument); *United States v. Coady,* 809 F.2d 119, 121 (1st Cir.1987)(counsel's mid-trial stipulation eliminated a defense); *see also South Port Marine LLC v. Gulf Oil Ltd. P'ship,* 73 F.Supp.2d 17, 22 (D.Me.1999)(plaintiff's lawyer waived damages in excess of amount requested at closing argument), *aff'd in part, rev'd in part on other grounds,* 234 F.3d 58(1st Cir.2000). Thus, contrary to Uncle Henry's view, there was no improper remittitur procedure here. Rather, at most, there was a correction to a jury award that was mistakenly duplicative of Uncle Henry's contract damages to the extent that it exceeded $77,382.99. If a verdict form is not precise enough for the jury to account for duplicative damages, the trial judge can resolve any dispute that emerges after the verdict is rendered. *See Garshman Co. v. Gen. Elec. Co.,* 176 F.3d 1, 6 (1st Cir.1999); *see also Britton v. Maloney,* 196 F.3d 24, 32 (1st Cir.1999)(involving post-verdict adjustments by the trial judge to avoid duplicative recovery).[19]

Our affirmance of the district court's correction of the jury's erroneous misrepresentation award moots many of Plaut's challenges to that award.[20] As to Plaut's argument that the jury did not intend to award Uncle Henry's anything for Dell equipment, we are unpersuaded. Plaut's analysis of the jury's verdict amounts to little more than speculation. The jury was free to conclude that, while Plaut did not convert the equipment, Uncle Henry's

---

18. Given that confusion resulted when the jury returned a higher figure, it may have been the better course for the district court to have incorporated the limitation in the jury instructions. *See, e.g., First Beverages, Inc. v. Royal Crown Cola Co.,* 612 F.2d 1164, 1175 (9th Cir.1980)

19. Indeed, the parties appeared to have anticipated that there might be issues of duplication in the verdict that the court would resolve.

20. We acknowledge Uncle Henry's argument that many of Plaut's claims were forfeited for not being properly raised below, but we disagree as to certain claims and elect to reject others on their merits.

would not have purchased it in the absence of the misrepresentation.

As to Plaut's arguments regarding reliance and causation, we note that such matters are typically jury questions. *See generally Rodi v. Southern New England School of Law*, 389 F.3d 5, 16 (1st Cir. 2004); *Correia v. Fitzgerald*, 354 F.3d 47, 56 (1st Cir.2003). Here again, the jury heard the conflicting evidence and was free to draw the conclusion that it did.[21]

### The Prejudgment Interest Award

Plaut argues that the district court erred in awarding Uncle Henry's prejudgment interest on the breach of contract claim at the 12 percent Massachusetts rate. Plaut argues that the Massachusetts rate cannot apply because the parties agreed on a different rate in their contract, or, alternatively, because Maine deems prejudgment interest to be a matter of state procedural law to be applied in all cases where Maine choice of law principles govern.

Plaut first argues that Section 6.3 of the contract, which is titled "Invoices," provides the appropriate rate in subsection (c): "A finance charge equal to the prime rate of interest from time to time quoted in *The Wall Street Journal* plus two percent (2%) per annum shall be assessed on any overdue payments hereunder." But this provision by its own terms applies only to invoices. *Cf. Quaker State Oil Refining Corp., v. Garrity Oil Co.*, 884 F.2d 1510, 1515 (1st Cir.1989) (distributorship agreement is separate and distinct instrument from invoices and promissory notes).

■ Plaut's alternative argument fares no better. Maine applies the Restatement to interpret contractual choice of law provisions. *See Schroeder v. Rynel, Ltd., Inc.*, 720 A.2d 1164, 1166 (Me.1998). The Restatement provides that the measure of recovery for breach of contract, including the availability of prejudgment interest and the appropriate rate, is determined by the law selected by the contract. *See* Restatement (Second) of Conflict of Laws § 207, comment e (1971). Moreover, Maine courts apply the law specified by the contract even where the result would be different from that reached under Maine law. *See Schroeder*, 720 A.2d at 1167.

### III.

For the reasons stated above, the judgment of the district court is ***affirmed.***

### APPENDIX

**Alleged Misrepresentations by Plaut**

**Taken from Defendant–Appellee/Cross–Appellant's Appendix, Vol. I, Exhibit 16**

1. Misrepresented the quantity and quality of progress on the project.

2. Misrepresented to Uncle Henry's that it could do the job for the $593,000 contract price.

3. Misrepresented that it would achieve Go Live status by 1/1/01.

4. Misrepresented that it would provide services in professional manner that meets standards in IT industry.

---

21. Plaut's argument that there was no evidence to support the jury's damage award on the negligent misrepresentation claim because Uncle Henry's did not show the equipment diminished in value fails because it was not raised below and is therefore forfeited, *see United States v. Sacko*, 247 F.3d 21, 24 (1st Cir.2001), and because we are not persuaded that plain error has occurred, *see Acevedo–Garcia*, 351 F.3d at 570.

5. Misrepresented that it would maintain staffing of professionals qualified to provide services at levels sufficient to meet the performance schedules; originally Uncle Henry's was told team was based out of Mass.

6. Misrepresented that its staff who services Uncle Henry's would have expertise and experience necessary to provide such services.

7. Misrepresented that it would provide Uncle Henry's a total solution unsurpassed in industry.

8. Misrepresented that it would migrate the existing site into a new architecture.

9. Misrepresented primary driver was "to do what's right for our client's businesses."

10. Misrepresented that it utilized a quality assurance program with internal quality reviews done at periodic intervals during entire project.

11. Misrepresented that its quality assurance program included code review, design review, progress gates, and acceptance milestones.

12. Misrepresented to Uncle Henry's that it would take snapshot of existing site and review code for specifics of existing features and functionality; further misrepresented that consultants would review and document code structure and this would provide basis for future site.

13. Prior to contract, misrepresented that work provided under contract would include developing website that included all features and functionality of Uncle Henry's existing website plus additions and enhancements.

14. Misrepresented that EdgeWing was proven company with long track record and many years of experience.

15. Misrepresented ability and experience working with Cold Fusion.

16. Misrepresented that "Migrating existing site ...," (¶ 2 Statement of Work) involved process that included taking site snapshot of existing UncleHenrys.com site, reviewing code for specifics of existing features and functionality, reviewing and documenting code structure and making review of existing code the basis of new site.

17. Misrepresented that Uncle Henry's will have available a test website to view progress and test various stages of building new website.

18. Misrepresented that Uncle Henry's in-house email would be set and handled as part of hosting.

19. Misrepresented that team would be based in Mass.

20. Misrepresented that it provided "fully-integrated, leading-edge eBusiness solutions to middle market companies through full lifecycle approach."

21. Misrepresented that it provided end-to-end approach [that] ensures same people who develop an understanding of business issues are people who actually bring your solution to life-true to the objectives outlined at the start.

22. Misrepresented that it "understood the realities of . . . tight deadlines."

23. Misrepresented that it shared with its clients "a work ethic-the one that says you're not finished until you've satisfied every promise made along the way."

24. Misrepresented that it had "the right combination of people and technology to make it happen for you."

25. Misrepresented it could help its clients "create new efficiencies in b2b [and] b2c," referring to "business to business" and "business to consumer" services.

26. Misrepresented it could "eliminate vendor-to-vendor handoffs" (that can often

spell delay-or disaster-for your development process) by "providing one-stop shopping" for "all your e-commerce needs."

27. Misrepresented it provided "a combination of best of breed technological strength, as well as consulting and hosting services that ensure speed, reliability and integrity."

28. Misrepresented that it had "over 40 experienced consultants with process and technical knowledge in developing the appropriate eBusiness solutions for clients."

29. Misrepresented the use of "Use Cases" to Uncle Henry's.

30. Misrepresented in website, marketing materials, initial proposal it employed a specific approach to website development called their Think, Run, Enable, Optimize program.

31. EdgeWing misrepresented that a binding contract was formed in October.